Daniels v. Fanduel, Inc. Mr. Holmes. Judge Easterbrook, thank you. May it please the Court. I'm Cliff Holmes, and along with my colleague, Todd McLaughlin, represent the appellants in this matter, Akeem Daniels, Nicholas Stoner, and Cameron Stingley. This case revolves around two straightforward propositions. First, that an invitation to transact is neither a newsworthy statement nor a report on a matter of public or general interest under subsections C-3 and C-1b of Section 1 of the Indiana Right of Publicity Statute. And second, that illegal speech is per se excluded under Indiana law from the scope of the protections conferred under those two statutory provisions. I will address each of these points in turn this morning. First, the C-3 statutory exception. Embedded in this exception is the term report. Counsel, the meaning of these clauses is, of course, a question of state law. Has the Supreme Court of Indiana ever addressed the meaning of this statute? No, Your Honor. The Indiana Supreme Court has not had occasion to opine on the terms that the parties have been addressing in the briefs in this case. I was struck by the fact that the citations all seem to be to federal district court opinions. Well, Your Honor, I think in part that is true. I think what the parties have done here is drawn on those available sources of Indiana law in construing these provisions. There are federal cases, we believe, appellants certainly believe, that are persuasive on these points. We have in our briefing certainly referred the court to cases from the Ninth Circuit, for example, the Abdul-Jabbar and Keller cases, where the claims that issued there were under the California right of publicity statute, which was passed in 1971 and which contains exception terms relating to news reporting that are very similar to the Indiana statute. It's not clear that California law rules Indiana. Well, Judge, we understand your point. In fact, you almost would think that the state of Indiana would do the opposite of whatever California did. Well, in this instance, Your Honor, we do have the benefit of having a California statute with very similar terms and in cases with similar facts and have seen the Ninth Circuit find in favor of plaintiffs on liability issues under the California statute. But going back to the ---- You are in the brief. Excuse me. Judge Rogner, is it possible to increase the volume? I'm worried about whether you can be heard. Would you try to do that? Okay. Let's try again. Okay. Thank you. You argue that in the brief, you argue that the exceptions in the Indiana statute are rooted in First Amendment law and, therefore, that illegal conduct is not included because it would not be protected under the First Amendment. But is there any provision in the statute or any Indiana case law that provides that the statute is coextensive with the First Amendment? Your Honor, we believe that, and this was argued by the defendants below as well, that the statutory exceptions here, the language thereof, appear to reflect a clear effort by the Indiana legislators to make sure that the statute itself was coterminous with certain protections available to speakers under the First Amendment preexisting the statute. On the illegality point, Your Honor, Indiana courts have been clear, and we've cited several cases in this regard, that illegal speech is, in fact, per se excluded from the scope of statutory provisions. Under Indiana law, unless the legislature within the body of the statute itself provides that illegal speech is included within the scope of the statutory provision, we've cited to the Seifert case, the Green case, and the Rocca case in this regard, Your Honor. And if it may please the Court. Yeah, but even if the statute was designed to address First Amendment concerns, what authority establishes that it is, therefore, defined by all the First Amendment jurisprudence? Well, Your Honor, we cite here, again, to four cases, LE Services, Rocca, Seifert, and Green. And the Indiana Supreme Court, in the Green case, cited to the Clark United States Supreme Court decision of 1933. And the holding of Clark was that when it comes to a speech privilege, that privilege exists and survives until there is an abuse, and vanishes when the abuse is shown to the satisfaction of the judge. But look, nothing in the statute indicates that speech to further illegal activities cannot fall within the exception. You know, the state may choose to address the illegality with criminal penalties or through other statutes, and absent some indication that Indiana courts interpreted the statute as coextensive with the First Amendment jurisprudence. I don't know that the treatment of illegal speech in the First Amendment is controlling this issue of state statutory interpretation. Well, Your Honor, on this issue, we've cited to the Rocca case in our reply brief. And the Rocca court summarized in that case, and this is at page nine of our reply brief, that where the issue in that case was whether the speaker had an entitlement to a privilege under a statute conferring that privilege to the patients of mental health treatment centers, that although the speaker relies on authority which states the legislature determines public policy through the enactment of statutes, Rocca maintains that even if common law would have shielded Southern Hills before the enactment of the mental health record statute, the legislature removed the shield with the passage of the statute. An abrogation of the common law would be applied where a statute is enacted which undertakes to cover the entire subject. For many years, this court has recognized those principles of public policy which justify the existence of the above exception, the physician-patient privilege, despite the absence of any exception language in the statute. And the court went on to hold public policy supports the recognition of an exception to the physician-patient privilege despite the absence of language that effect in the statute which established the privilege. The exception exists where the communications were made for an unlawful purpose, the objective of which is the commission of a crime. And thus, the Rocca court, faced with very similar facts to this case, Your Honor, noted that it had been argued in the case that the absence of language in the statute directed to the issue of illegal speech should defeat the notion that illegal speech fell outside the scope of the statute. And instead, the Rocca court held, no, the opposite presumption is true. Unless the Indiana legislature steps forward and states affirmatively that illegal speech is included within the shield, it's outside of that shield. And, Your Honor, I think in this regard, an imperfect but somewhat helpful analogy might be the implied covenant of good faith and fair dealing in all contracts. Indiana courts, time and again when they're faced with this question under statutes, have held that illegal speech is outside the scope of the speech protection conferred under the statute. And we've cited four cases in this regard, Your Honor, and there is no precedent that the appellees have cited of any case where illegal speech has fallen within the scope of a speech protection in a statute. So, in that regard, Your Honor, we've referred you to the Rocca case, the LA Services case, and the other cases. And if I may, though, I'd like to return just back to the plain language of these statutory exceptions being claimed. And I think the court can see here that these invitations to transact by placing price tags on the plaintiffs, on their identities, on their persons and on their bodies, falls well outside the scope of these statutory provisions, these exceptions. Under C-3, a reporting is required by the speaker. I must say, counsel, I don't understand the significance of the fact that the website uses the word dollars rather than, say, the word kuatloos. It's just monopoly money. It doesn't have anything to do with financial transactions. Your Honor, we respectfully disagree, and quite strongly, Your Honor. Judge Easterbrook, we have included at page 30 of our opening brief a chart which demonstrates that there's no daylight between the, as you use the term, artificial dollar figures under these fantasy salaries and actual dollars and cents to transact. When DraftKings put a quote-unquote fantasy salary on Mr. Stingley for the week of December 1, 2014 of $4,800, because DraftKings had a salary cap of $50,000 for their players, if a DraftKings customer paid $50 as an entry fee to gamble on the DraftKings site, that same user paid $4.80 from Mr. Stingley. It's a one-to-one relationship. There's no daylight. I don't understand why it matters that it's denominated in dollars. The way in which any fantasy league works is to produce some scarcity. Otherwise, everybody picks all the best players. You have to create scarcity. You could have a dollar cap, you could have a cap on points, or you could have a cap on quotas, which were used for gambling in Star Trek. There's nothing real about this. It has no relevance to actual money. I just don't understand the point. Well, Judge, what DraftKings would do is they would tell their players that for a $50 entry fee, they could allocate those $50 across the scope of nine players. And those players were assigned salaries, which are price tags. So for Cameron Stingley to be a $4,800 fantasy salary, that equates directly to $4.80 of the player's money allocated to Mr. Stingley. You're not answering my question. Suppose the fantasy salary was $4,800 quant lose. Would that matter to your argument? So, Judge, what we're saying here is that when... I think the answer to that question is yes or no, and then you can explain why. Your Honor, the term quant lose would not matter. We're putting forth here, Judge, that for any user of the DraftKings site that puts down $50 of real U.S. cash currency to compete in a given week on a contest, they then have to on page 30 shows that for a $4,800 salary to Mr. Stingley, that equates exactly to a $4.80 U.S. dollar real world currency price. And what we're saying, Judge, is a statement by Jewel Osco that oranges are... I think that you would be better served by devoting what's left of your limited time to discussing the actual language of the state statutes. Your Honor, certainly. We have here under this reporting prong of C3 a requirement that the speaker be reporting on a subject matter of general or public interest. DraftKings calls itself a casino. This is alleged in the complaint and cited at paragraph 46 of the amended complaint. A casino is not a news media entity. A casino is not the Chicago Tribune. Appellants submit that this court should take DraftKings at its word concerning what line of business that it's in. When Harris Casino advertises its own gaming contests, the pricing thereof, Harris Casino is not making a statement on a reporting on a matter of general public interest. Harris Casino is talking about its own private gambling operations. We also know, moreover, Your Honor, that the users of both of those websites to gather information about statistics and the like, they were there to gamble. The purpose of the websites is to allow the users to gamble on the college athletes. And here we have all three of our plaintiffs having received price tags from these defendants without their consent. Judge, under... Back to the price tags business. It just loses me. Why not just stick with the language in the statute? Well, Judge... Now, Judge, the district judge said one can turn to these sites to get information about the player's stats. And I take it that you agree that their statistics are in fact newsworthy. They're reported in the newspapers. They're reported on ESPN. I gather without challenge from you. Well, Your Honor, there's nothing in the record below on the use by the defendants of statistics with respect to plaintiff Nicholas Stoner. All that we know in the record below is that they assigned a price tag to his head. There's not one iota of evidence that they ever discussed his statistics. Look, I think if your case depends on the argument that they assigned a price tag, you've just dug yourself a hole from which you cannot escape. Because that has absolutely nothing to do with the square the circle for you in that regard. I don't know why you want to say that because in geometry that is impossible. That's why squaring the circle is a phrase. It's a phrase for something that cannot be accomplished. Maybe you'd like to do something else. Then let me connect the dots, Your Honor. Let me connect the dots. The Jordan case involved the placement by Jewel Osco of Michael Jordan's name and image on the same page as the Jewel Osco logo. This court held that that mere placement on the same page of an advertisement conferred valuable brand enhancing benefits to Jewel Osco. In this case it goes much further. These plaintiffs, Mr. Stingley, Mr. Daniels, Mr. Stoner, are the actual products being offered by the defendants. Look, we really want to talk about the language of the statute. Because now it sounds like you're saying that it would violate Indiana law to discuss these players' achievements on ESPN because ESPN sells advertisements. That's how it makes its money. And it is doing this for the purpose of making money, not for any other purpose. And therefore ESPN can't discuss them. And I presume the Your Honor, the C3 privilege, statutory privilege being claimed by the defendants in this case, requires that the appellee's own material have newsworthy value. Not just that the players be newsworthy in some respect because they're in the public eye and they play college sports, but their material. That is why when we look at Plaintiff Stoner, there's no indication that his statistics were discussed in the That when you have a product, if you have Coca-Cola offering its bottles in the state of Indiana, if they put Mr. Stingley's face and image on the top of the bottle cap and said, guess how many touchdowns Mr. Stingley will score in his next game and win a free case of Coke. That would violate the Indiana statute under its terms. And the facts that we have here are more egregious. These plaintiffs themselves are the product. They're being offered. Mr. Stingley was referred to as being available at a cheap price by DraftKings. Cheap in reference to what? Well, cheap in reference to the price offered on Mr. Stingley by their competitor, FanDuel. These two companies were competing with one another in the offering of these athletes on their websites. And so thus we think that both defendant's speech in this case falls well outside the C3 exception because the material that the defendants produce must have itself have newsworthy value. And an invitation to transact where there's putting a price on a bag of oranges by Juul, a naked invitation to transact does not have that newsworthy value. And we believe the Jordan case stands squarely for this proposition. We also would like to point, direct the court's attention to this court's Baltimore Orioles decision from 1986. In that case, this court affirmed that a company without the consent of a player using the player's name to advertise its product gives right to a violation of the player's right of publicity. In that case, the product that was being advertised that the Seventh Circuit, this court was considering was a game, quote, based on the player's career statistics, end quote. And Baltimore Orioles was affirmed by Tony in 2005. And thus we believe that there's a wide body of consistent with a wide massive precedent concerning what gives rise to an athlete's violation of an athlete's right of publicity that lines up and leads to the finding of a violation in this case. Could people who were not registered with the website and who did not participate in any of the transactions, could they access all of the information as to the athletes on the site so as to use it as a mere informational resource? Your Honor, that is an important question. And the answer is no. And so the only reason that users would go into the DraftKings and FanDuel sites was to gamble. It was not to buy information about these athletes. The transaction was put money down for the user that went into the DraftKings and FanDuel sites that the user would then receive information concerning what prices were being offered on each player and then gamble on the site. So we do know in one instance, Your Honor, Judge Rovner, that DraftKings advertised Mr. Stingley's pricing during the week of December 1st, 2014 on the exterior portion of its site. That was the $4,800 reference that I made earlier. That would be comparatively speaking a rarity. They do advertise certain individual players if they're seeking to hype that player for that week on the exterior portion of their site if they want to induce more gambling dollars being deposited in their pools, such that we know in this case, Your Honor, let me give you an example. If you compare paragraphs 62 and 94 of the amended complaint, FanDuel had a different price that they were offering on plaintiff Nicholas Stoner from what DraftKings offered. DraftKings' price on Nicholas Stoner was $3.40. FanDuel's price was $3.75 because what happens is DraftKings has a salary cap of $50,000. FanDuel has a salary cap of $60,000 and because they're both putting different prices they're submitting their subjective value judgments about whether perhaps they want to recruit more University of Indiana student gambling customers. It was actually possible within the term of this case to point out to the panel for those 18 and older walking around college campuses, the classmates of Mr. Stingley and Mr. Stoner and Mr. Daniels to actually purchase each of those three for an upcoming college daily fantasy contest. I see that my time has expired. I've reserved three minutes for rebuttal. Your time has expired. Thank you. Thank you, Mr. Holmes. Mr. Gershengorn. Good morning, Your Honors. May it please the court. Ian Gershengorn for Appalese, FanDuel, and DraftKings. I'd like to get to the illegality and other arguments that were raised by Mr. Holmes, but if I could start with just a couple of minutes on framing, if I might. The district court's decision below was correct and squarely in line with the right of publicity cases like CBC from the Eighth Circuit and like CBS Interactive. Are any of these from the Supreme Court of Indiana? So none of those cases are from the Supreme Court of Indiana. We're not trying to decide this under some other state's law, but under Indiana's law. That's correct, Your Honor. And that bugs me, I must say. When we see cases in which federal courts are completely at sea, in the sense there are no signposts from the state judiciary, I'm inclined to think that we should perhaps certify this to the state court and get an authentic reading of state law rather than try to guess. So, Your Honor, certainly the court has the power to do that, but I urge that it's unnecessary here for a couple of reasons. First of all, although Your Honor is absolutely correct, it's a matter of Indiana state law. The exemptions that are in the Indiana statute are actually quite similar, particularly on the reporting one, as to the ones that are in existence in other states like California and Minnesota and Texas. So, for example, when the court in Dreyer, Your Honor, evaluated the case, the court dealt with the newsworthiness exception, and it dealt with it for New York, for Texas, for California. Let me tell you what my problem is with that. You, like the district judge, refer to C1B as a newsworthiness exception. That's not what it says. The question is not whether an athlete's statistics are newsworthy. The question is whether it appears, and I quote, in material that has political or newsworthy value. So the question is, is the FanDuel fantasy game itself newsworthy? And I will confess to you that I've never seen ESPN report on whether Joe Smith beat Jim Green on FanDuel. That's not ever reported. So, Your Honor, I think a couple of responses to that. Your Honor is absolutely right to focus on the statutory language. But the question is whether the use of the name is in material that has newsworthy value. We think the answer to that is yes, and it's yes in two senses. First, the statistics themselves are newsworthy, and that is material that has newsworthy value. That's what the statute says. It's the use of a name in material that has newsworthy value. At the very least, wouldn't we need further factual development here before we can determine whether the exceptions apply? Your Honor, I don't think so. I think this is the kind of thing that this Court can determine as a matter of law, because I don't think the facts are undisputed in just the way Mr. Holmes' colloquy with Judge Easterbrook indicated. The way fantasy works, I think, to have the case go back so we can figure out how fantasy works, there's no dispute on that. That's not something that anybody has... Yeah, but there is a dispute as to what the state of Indiana thinks its statute means. But, Your Honor, that's not something to go back for further development. And I don't think, actually, that there is a dispute in this sense. Let me try to explain, if I could, why we think this has... why both the information and the game itself has newsworthy value. The information, the statistics, has newsworthy value. I don't think anybody really disputes that. And Judge Easterbrook, that does fit within the statutory language. But it's integrated... Statistics are not used in looking up statistics. There are websites that just have statistics. They're used in playing fantasy sports leagues. And so the question, it seems to me, they're used in at least two ways. And it may be that if FanDuel just offered statistics, it would be used in a... But that's not the only way in which it's used. That's what bugs me. So can I give you the two reasons why I think, even taking Your Honor's construct, why we easily satisfy. First, the game itself integrates the statistics. And this is in an important way. The user's entire interaction with the game is through and using the statistics. You look at the statistics to assemble your virtual roster. You project how the athlete's performances are going to affect your team. Once your team is assembled, you look at the real up-to-the-minute statistics on the website to see how the team is doing and to see how you are doing against the other users. And the next morning, you evaluate the statistics to see how your team did. But if I could make a second point, which I think is critical. The interactive nature of the game itself is newsworthy and helps contribute to the understanding of the statistics. Let me give you one analogy and then circle back. On the New York Times website, there's an interactive way to try to balance the budget. And what it teaches you is that if you lower defense spending, you have to raise entitlements. Or if you want to pay for infrastructure, you have to reduce foreign aid. And the interactive nature of that site is itself educational and informative. FanDuel and DraftKings and ESPN and CBS do that same thing. They put you in the position of a general manager, making tradeoffs on the kinds of salaries that Your Honor was discussing earlier with Mr. Holmes. They give you that insight into the statistics. I'm sorry, Your Honor. Even if the statistical information or ranking of athletes can be deemed newsworthy or of general interest, such as in those books like, you know, that, what, Bill James handbook or other... The Baseball Abstract, yeah, or I'll know. Or other, whatever, these reports. Don't we have to look at the nature of the particular use of the athlete's name and likeness? For instance, if Gatorade ran ads which included the names of exceptional athletes, could it avoid rights of publicity concerns by merely including statistics as to those athletes in its ads? No, Your Honor, it couldn't. And that's what cases like Abdul-Jabbar and Jordan stand for. But this is a million miles from that. If I could, I think actually the proposition that the court should accept to decide this case is really the opposite, that newsworthy information doesn't lose its newsworthiness by being incorporated into a game. What the courts have said over and over is the line between informing and entertaining is elusive, and we think here it disappears entirely. Statistics and newsworthy information don't lose their value by being incorporated into a game, like information on statistics, if brought into Trivial Pursuit or to Jeopardy or to a news quiz like Wait, Wait, Don't Tell Me. It doesn't then lose its newsworthy value just by being brought into a situation... Is there anything you're saying here that couldn't be said equally about, say, Madden Football? Yes, Your Honor. You might say Madden Football would teach you how to use statistics, but I gather that it's been determined that the right of publicity means that Madden Football has to pay for the people whose data it uses. So, Your Honor, the Keller case did decide there was a dissent in that case, but I think critically for the present purposes, the answer to that, to Your Honor's question, is the Keller case itself distinguishes these statistics. What Keller says is the difference between the EA game that Your Honor is discussing and the site here. The Ninth Circuit poses a test. Is there a means for obtaining information about real-world football games? And what the Ninth Circuit majority held, Judge Bybee's opinion, was the answer for that in the EA context, in the Madden context, was no. But he specifically distinguished the fantasy sites that we have here. Those are means for publishing and reporting factual data, and a means, critically, means for obtaining information about real-world football games. So that's the test that the Ninth Circuit applied. That's the test that the Court then used in the Dreyer case, and we think application of that test here easily distinguishes the video game situation, even if Your Honor, I don't think the Seventh Circuit has weighed in yet, even if Your Honor were to agree with Judge Bybee rather than Judge Thomas. And more to the point, neither has Indiana. Well, neither has Indiana, Your Honor. There's no doubt. I can't dispute the Court's authority to ask Indiana for questions, but I actually think this is the kind of legal question that this Court No, look, I completely understand that your position in your client's interest is that the sequence you prefer is win, certify, lose. And I'm perfectly sure that your opponent has exactly the same preferred sequence. Your Honor, so I guess I, just to be clear, I think we do think the Indiana, I think the Indiana courts would go our way. But the reason I, again, just to repeat that I don't think you need to certify, is these are the kinds of questions that the federal courts are deciding all of the time. This is the question that the Ninth Circuit decided in the very case Your Honor is talking about, in the Keller case. It's the question that the court decided in the Dreyer case. These are, the application of right of publicity statutes is something that the court, the federal courts have decided. And these exceptions are quite similar across the state codes. And so while Your Honor is certainly correct that on many things Indiana and California might disagree, there actually isn't a reason to think that they would on these kinds of questions, in part because at the end of the day not on this appeal, but at the end of the day we're bounded by the First Amendment, which of course is a federal question that doesn't vary state to state. And so I think on the question of whether something is newsworthy, those are the kinds of concepts that this court routinely decides and is quite comfortable with. And so the idea that Indiana would have some quirky understanding of what newsworthy means is hard to take. And I think particularly... It might have some quirky understanding of what a statute means. So Your Honor... I'm sorry Your Honor, I'm going to cut you off. Please go ahead. You know, what the plaintiffs have alleged is that the names of individual athletes were widely used for advertising purposes to, you know, induce customers, such as by offering athletes as value purchases or on sale for a week. And they also allege the prominent use of photos of various college athletes for advertising purposes on the website. Now, how could an ad such as that for the product of the fantasy wagering be considered a use that would fall within an exception or the exception? So Your Honor, I don't think that with respect to the named plaintiffs, I think if you look at the complaint that that kind of advertising is... I think it's a loose use of the word advertising in the sense that I think that with respect to the plaintiffs, what they're talking about is the use in commentary that so-and-so, Mr. Daniels, is a good value this week or something like that. We are not here to defend. And I think what the cases do separate quite clearly is the kind of one-athlete advertising that Your Honor is positing in the Gatorade hypo, in the Coke bottle hypo, in Abdul-Jabbar, and in Jordan, on the one hand. And then cases like CBC, Cardtoons, Gianfrido, Dryer, on the other hand, that are using lots of athletes. And I think it sort of gets to the nature of the right of publicity to show how far we are from the core rights. What we are talking about here is information that's in the public domain. We're talking about the use of all of the athletes in a sport. So the risk of endorsement or false endorsement is quite small. You're not talking about it in the context of a buy now or image advertising situation. And you're not talking about it in the Zucchini context where you're taking away the incentive to create the very thing, where you're taking away the performance. You're talking about non-proprietary data that is of tremendous interest. And that, I think, does separate. And the cases reflect that, Your Honor. That is the distinction that... I mean, the cases aren't all dealing with the exact same provision, as Judge Easterbrook has reminded me. But they do actually fall pretty neatly along that fault line. And I think that that is the insight that the district court had and that this court should follow. I think even the Keller case, Your Honor, reflects that. That is the game case. But again, even there, what the court did, even if you take the majority, Judge Thomas, of course, took a different approach, which would be much more favorable to us. But even Judge Bybee went out of his way in the majority opinion and in the footnote at page 1283 of the opinion to discuss the differences between the fantasy games at issue here and the game at issue there. And so I think it really would be the first time that a court decided that a game like this premised on statistics and the use of statistics would be an actionable right of publicity case, at least in the recent case law. I mean, there are some older ones, but the more recent cases do fall right on that fault line. And we think that makes good sense, in part, as I say, because we are very far from the core of the right of publicity. I don't know whether it makes sense, Your Honor, to address the illegality points and the salary points, but let me just do so very briefly while I have my time. On illegality, I don't think I could have said it better than Judge Roedner did, which is to say we should not be adding exceptions to the statute that Judge Roedner implied, that we shouldn't be adding exceptions to the statute that aren't there. This is a comprehensive statute with a lot of exceptions. It goes on for nine pages in the appendix to the brief. The legislature considered a whole host of policy judgments. It made exceptions to the statute. It did not include one here. The court, I think, should be very hesitant to add to that, in part because illegality, I think, is both under- and over-inclusive in some ways. It doesn't really map onto the injury that right of publicity is trying to get at. Whether you lose some commercial opportunity doesn't depend, I don't think, on whether it's illegal or not. And on the flip side, if you have an objection to it, it may go beyond illegality. So I don't think that an illegality exception really makes any sense here, and it really is the kind of judgment that the legislature should make. The other side points to the Rocha case. I think Rocha is easily distinguishable. In fact, it distinguishes itself. The Rocha statute was a bare line that said, there is a mental health privilege. And then what Rocha itself said was, the legislature did not undertake to cover the entire subject of the privilege or of confidential communications related to mental health with the passage of the statute and did not design the statute as a substitute for the common law. It's a very different situation than we have here, where you have a finely detailed and important statute that addresses all of the policy questions. On the salaries issue, I think Judge Easterbrook discussed that at some length. Just to nail that down, we completely agree that the salaries don't add anything to the plaintiff's case. They are, in a very real way, the same as statistical information. They are derived from the statistical information. They're meant to be a proxy for statistical productivity. And of course, in some ways, they're just a ranking. If somebody would be newsworthy to say, LeBron James is twice as good as Al Horford or some other player, this salary sort of does the same thing in a ranking situation. If I could then just swing back, Your Honor, and close with two points. One more on the certification question that Judge Easterbrook is asking. The other reason why I don't think a certification approach is necessary here is, this is not some special language that Indiana came up with on its own. If Your Honor looks at, for example, the language of the reporting statute, and it says, the use of a personality's name or likeness in connection with the broadcast or reporting of an event or a topic of general or public interest, and you compare that, for example, to the California statute, which is commonly interpreted by the Ninth Circuit, which limits the use... I think you've said the magic phrase. If we go to figure out what the California statute means, you're directing us not to the Supreme Court of California, but to the Ninth Circuit. All of these cases seem to be federal. We don't seem to have any genuine state law anywhere. So I don't think that's right, Your Honor. Gianfrido, for example, a case we rely on tremendously, is an interpretation of that very language in California, which is virtually identical to the language in the Indiana statute. And Gianfrido, we think, is quite an important guidepost, and we rely on it tremendously in the brief. But we don't think that Gianfrido adopted some magic or surprise interpretation. What the courts have done is sensibly, as I say, divided the world so that things that are true advertisements or image advertising, the Jordan, Abdul-Jabbar, Gatorade examples, those things are covered. But things where you have a broader use of statistics to cover are not. And that reflects the kind of First Amendment interests that are animating these. Of course, it's not coextensive with the First Amendment. Keller says that for the California statute. Judge Roedner, you're exactly correct. The same is true here. But those same interests are governing. And that's why I think, Your Honor, the certification is unnecessary. Because the same language is different because California has a very different policy than Indiana. In fact, it's the opposite. If you look at Dreyer, what Dreyer says is these states all basically interpret the things the same way. And in part, that's because they're using off-the-shelf language. And in part, it's because they're animated by the kind of First Amendment concerns that put a baseline on how much flexibility a state could have. In short, it seems to me that the newsworthiness and public interest exceptions apply here because the statistics themselves are newsworthy and because they're integrated into an interactive game that not only entertains but helps users to understand in new and deeper ways both the statistics and the sports in general. Thank you. Thank you, Mr. Gershengorn. Mr. Holmes, you got asked a question just as you might have been trying to save some time. So I will give you one minute for rebuttal. Thank you, Your Honor. Four points on rebuttal very quickly. First, the statute is not a bare cupboard. Section 4 of the statute defines a news reporting medium. News reporting medium is in any which derives its revenues from advertising. These defendants do not derive revenues from advertising. Second point, the defendant's attorneys argue that the player's salaries are a proxy for statistics. That is a representation by the defendant's record to support this proposition. In fact, the sole reason that DraftKings made the statement that Cameron Stingley was available at a cheap price December 1, 2014 was to distinguish their price for Cameron Stingley from that of their competitor, FanDuel. Both companies were offering Cameron Stingley for sale and DraftKings wanted the user to purchase from them. Third point, Judge Rovner, I think the 12B6 factual development point is very well taken. There's no discussion of Nicholas Stoner's statistics in the record below. And last point in closing, Section 6 specifically defines a name as a protected aspect of a person's right of personality under this statute. In closing... Yes, thank you, Counsel. Thank you, Your Honor. The case will be taken under advisement. Our next case for argument